**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION**

**JASON HINES, Individually**                                                    **PLAINTIFF**
**and as Wrongful Death Beneficiary**
**and as Survivor of Austin Hines**

**V.**                                                                 **NO. 1:21-CV-52-DMB-RP**

**COLUMBUS, MISSISSIPPI, et al.**                                         **DEFENDANTS**

## OPINION AND ORDER

Jason Hines commenced this case in the Circuit Court of Lowndes County alleging that Columbus, Mississippi; Lowndes County; and various law enforcement officers violated his son Austin's constitutional rights, resulting in Austin's death. After the case was removed to federal court, Lowndes County and the County officers moved for summary judgment asserting qualified immunity. Because the Court finds that Jason has abandoned multiple claims, that the officers are entitled to qualified immunity on the excessive force claims, and that no federal claims remain following the parties' stipulations dismissing certain claims, the abandoned claims will be dismissed, summary judgment will be granted on the excessive force claims, and the state law claims will be remanded to state court.

**I**
**Procedural History**

On November 18, 2020, Jason Hines, individually and as wrongful death beneficiary and survivor of Austin Hines,[1] filed a complaint in the Circuit Court of Lowndes County, Mississippi, against Columbus, Mississippi ("City"); Lowndes County, Mississippi; Jemarco Harris; Landon George; Ronald Crabtree; Eddie Hawkins; Thomas Culpepper; and John Doe Officers 1-15. Doc.

---

[1] For clarity, Jason and Austin will be referenced by their first names.

#2. Hawkins was named in "both his individual and official capacity as sheriff of Lowndes County." *Id.* at 3. The complaint alleged violations of Austin's Fourth, Eighth, and Fourteenth Amendment rights as well as a wrongful death claim, all arising from Austin's death in an officer-involved shooting. *Id.* at 1, 14–18.

Asserting federal question jurisdiction, the County, Hawkins, and Culpepper removed the case to the United States District Court for the Northern District of Mississippi on March 9, 2021. Doc. #1. The City, Harris, George, and Crabtree joined the removal two days later. Doc. #3. After the parties stipulated to Crabtree's dismissal,[2] Jason, with leave of the Court,[3] filed an amended complaint adding Thomas Honnoll as a defendant. Doc. #54.

On December 1, 2021, the County, Culpepper, Hawkins, and Honnoll filed a motion for summary judgment,[4] Doc #68, and a motion to strike Jason's expert Randy Foster, Doc. #71. Both motions are fully briefed.[5] *See* Docs. #70, #84,[6] #88 (summary judgment briefing); Docs. #72, #80, #82 (strike briefing).

On February 4, 2022, the parties stipulated to the dismissal of the City, Harris, and George. Doc. #92. The remaining parties filed multiple motions in limine seeking to exclude from trial certain evidence and testimony. Docs. #96, #98, #100, #102, #104.

## II
## Summary Judgment Standard

A court shall enter summary judgment if "the movant shows that there is no genuine dispute

---

[2] Doc. #22.

[3] Doc. #52.

[4] In violation of the Local Rules, the motion exceeds four pages. *See* L.U. Civ. R. 7(b)(2). However, because two full pages are dedicated to the listing of exhibits, the violation will be excused in this instance.

[5] Jason also filed a motion to strike multiple summary judgment exhibits, Doc. #81, which the Court denied, Doc. #121.

[6] In violation of the Local Rules, Jason did not file a separate response and memorandum brief. L.U. Civ. R. 7(b)(2) ("The memorandum brief must be filed as a separate docket item from the motion or response and the exhibits.").

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is genuine if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party." *Jones v. United States*, 936 F.3d 318, 321 (5th Cir. 2019) (cleaned up). "A fact is material if its resolution could affect the outcome of the action." *Dyer v. Houston*, 964 F.3d 374, 379 (5th Cir. 2020). "A court must resolve all reasonable doubts and draw all reasonable inferences in the light most favorable to the nonmovant." *Sanchez v. Young Cnty.*, 956 F.3d 785, 791 (5th Cir. 2020).

The "party seeking summary judgment always bears the initial responsibility of demonstrating the absence of a genuine issue of material fact." *Jones*, 936 F.3d at 321 (alterations omitted). When the movant would not bear the burden of persuasion at trial, he may satisfy his initial summary judgment burden "by pointing out that the record contains no support for the non-moving party's claim." *Wease v. Ocwen Loan Servicing, L.L.C.*, 915 F.3d 987, 997 (5th Cir. 2019). If the moving party satisfies his initial burden, the nonmovant "must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Jones*, 936 F.3d at 321 (cleaned up).

### III
### Relevant Facts[7]

On April 1, 2020, Jason Hines was asleep at his girlfriend's house when his son Austin woke him up because Austin "wanted keys [to a vehicle] to go to Caledonia." Doc. #68-2 at 20. Jason gave him the keys to a truck owned by Brent Cohen (Jason's girlfriend's roommate) without informing Cohen. *Id.* at 21–23. Cohen called 911 to report the truck stolen. *Id.* at 21. A report

---

[7] Because Jason's response to the summary judgment motion does not rely on his expert Foster's opinion, the Court need not address the defendants' motion to strike Foster before considering whether summary judgment is proper.

that the vehicle was stolen was dispatched at 7:04 a.m.[8] Doc. #68-5 at 1.

After hearing the stolen vehicle report, Detective Tony Cooper observed Austin in the truck, saw Austin fail to stop at a stop sign, and activated his emergency lights. Doc. #68-7. When Austin failed to pull over, a pursuit ensued.[9] *See* Doc. #68-10 at 8–9 (deposition of Marley Shaw, passenger in the vehicle driven by Austin). Deputy Thomas Honnoll and Deputy Thomas Culpepper ("Deputy Defendants") were involved in the pursuit, which lasted over twenty minutes.[10] *See* Docs. #68-13, #69-6.

The Deputy Defendants both activated their body cameras during the pursuit of Austin. *See* Docs. #68-25 (Culpepper body cam video), #68-26 (Honnoll body cam video). Culpepper observed Austin "driving recklessly and at a high rate of speed, not slowing down at any intersection, and running stop signs," and saw Austin "driving towards [him]" causing Culpepper to "pull[] off to the side [of the road] to avoid getting hit." Doc. #69-6 at PageID 668; *see* Doc. #68-25 (body camera footage where Culpepper is heard saying, "I've got him right here, he's coming at me, he just went around me"). The body camera footage shows the pursuit proceeded through residential neighborhoods based on the direction Austin drove. *See* Doc. #68-25 (displaying houses in the background). A voice coming across the police radio stated that Austin "hit a car" and "hit an 18-wheeler." Doc. #68-26. Eventually, Austin wrecked the truck and fled on foot. Doc. #69-6 at PageID 668.

---

[8] While Jason argues that the vehicle "was not actually stolen" because "[a]s far as Austin … was concerned, he had permission to drive the car," Doc. #84 at 4, Jason did not submit any evidence to dispute that Cohen reported the vehicle as stolen to the police.

[9] Jason asserts that "[t]he facts of the pursuit are disputed" and contends the officers "were the aggressors trying to ram Austin and run him off the road." Doc. #84 at 4. However, the undisputed evidence shows Austin did not stop for the officers.

[10] The Court draws the relevant facts of the pursuit mostly from the Deputy Defendants' body camera footage along with their pre-complaint statements though the defendants submitted other body camera footage, statements from other officers, and surveillance videos which corroborate such facts.

Once Austin abandoned the truck, the Deputy Defendants parked and exited their vehicles at approximately 7:50 a.m. Docs. #68-25, #68-26. A "shots fired call" came over the radio less than ten seconds later and the Deputy Defendants proceeded into a field to try to locate Austin.[11] Docs. #68-25, #68-26. Their body cameras show a number of other law enforcement officers at the scene,[12] a set of train tracks bordering the field, and an officer[13] walking towards the tracks. Docs. #68-25, #68-26. Approximately forty seconds after the officers exited their vehicles, a Dodge truck with activated police lights started driving towards and then past the Deputy Defendants. Docs. #68-25, #68-26. Honnoll is heard shouting "he's in the Dodge, he's in the Dodge," which belonged to the County. Docs. #68-25, #68-26; *see* Doc. #69-6 at PageID 668–69 (Culpepper's statement that he "saw one of the Sheriff's Offices unmarked Dodge Ram truck [sic] with emergency lights on coming towards [him] and other deputies from the area where the shot was fired"); Doc. #69-1 at 18 (Honnoll's deposition testimony that he identified Austin "[w]hen he drove past us in Detective McCain's vehicle," after which Honnoll "started calling out on the radio to pass along to the other units that [Austin] was in the [County] vehicle"). The Deputy Defendants identified Austin as the driver. Doc. #69-6 at PageID 669; Doc. #68-13 at PageID 591. The body camera footage shows the Dodge driving away from the Deputy Defendants before turning to the left and heading towards the train tracks. Doc. #68-25, #68-26.

---

[11] Without citation to evidence, Jason argues that "Detective McCain fired the only shot" and there is no evidence that Austin had a gun. Doc. #84 at 7.

[12] The investigative file contains statements from twenty-two officers other than the Deputy Defendants who had some involvement in the pursuit, responding to police calls linked to the pursuit, the shooting, or the investigation following the shooting. *See* Doc. #68-3 at PageID 458, 478–500, 502–13.

[13] This officer is presumably Ric Higgins. Although the officer's identity cannot be conclusively determined to be Higgins based on the body camera footage, various statements support this conclusion. *See* Doc. #68-4 at 38 (Culpepper's deposition testimony that Higgins was on top of the railroad tracks); Doc. #69-2 at PageID 660 (Kevin Forrester's statement that he "witnessed who he thought was Captain Ric Higgins on the railroad tracks walking toward the truck); Doc. #69-5 at PageID 665 (Higgins' statement that the County vehicle "started to drive north down the railroad tracks toward [him]").

The body camera footage then shows multiple officers shooting at the Dodge, approximately fifteen seconds after the Dodge first passed the officers. Docs. #68-25, #68-26; *see* Doc. #69-6 at PageID 669 (Culpepper's statement that he "fired 10 rounds into the door/side window" when he saw Austin approaching an officer); *see* Doc. #68-13 at PageID 591. The Dodge stopped briefly after appearing to become stuck on the railroad tracks and the shooting stopped. Docs. #68-25, #68-26. The Dodge then began moving forward again in the direction of an officer standing on the tracks and the shooting resumed until a "cease fire" was called. Docs. #68-25, #68-26; *see* Doc. #69-6 at PageID 669 (Culpepper's statement that he "fired 4 rounds" because the vehicle was still moving towards an officer); Doc. #68-13 at PageID 591 (Honnoll's statement that he "discharge[d his] firearm three to four times"). The body camera footage shows officers on the opposite side of the tracks in the direction the Dodge was heading. Docs. #68-25, #68-26. An officer,[14] along with multiple other officers, approached the Dodge and confirmed Austin had been shot. Docs. #68-25, #68-26. Approximately thirty seconds passed from the time of the first shot and the cease fire being called, and less than two minutes passed from the time the Deputy Defendants exited their vehicles and other officers confirmed Austin had been shot. Doc. #68-25, #68-26.

Austin suffered gunshot wounds to his head, abdomen, right arm, left arm, right leg, and left knee. Doc. #69-11 at PageID 683. Austin died as a result of these injuries. *Id.* at PageID 687.

## IV
## Analysis

The defendants argue summary judgment is proper because (1) Hawkins, Culpepper, and

---

[14] The officer seen in the body camera footage approaching the truck is likely Lance Luckey. Although Luckey's identity cannot be definitively ascertained from the body camera footage, his statement confirms that he "approached the vehicle;" attempted to open the "the passenger side door but it was locked;" and "ran around to the driver side door, reached in and turned the vehicle off." Doc. #68-3 at PageID 503.

Honnoll are entitled to qualified immunity on Jason's claims against them; (2) claims against Hawkins in his official capacity are duplicative of claims against the County; (3) Jason cannot establish municipal liability against the County; and (4) Jason's state law claims fail. Doc. #70 at 12.

## A. Conceded Claims

In response to the motion for summary judgment, Jason "concede[s] the claims made against Hawkins and the County based upon 42 USC 1983." Doc. #84 at 15. Accordingly, these conceded claims will be dismissed. Because Jason conceded these claims, the Court need not address the defendants' arguments that the official capacity claim against Hawkins is duplicative of the claims against the County or that the County cannot be held liable. The motion for summary judgment with respect to those claims will be denied as moot.

## B. Qualified Immunity

"Section 1983 enables persons who have been deprived of any rights, privileges, or immunities secured by the Constitution and laws of the United States by the actions of a person or entity operating under color of state law to seek redress from those state actors responsible for the deprivations." *Orr v. Copeland*, 844 F.3d 484, 491 (5th Cir. 2016). But "[t]he doctrine of qualified immunity protects [individual] government officials from civil damages liability when their actions could reasonably have been believed to be legal." *Zadeh v. Robinson*, 928 F.3d 457, 463–64 (5th Cir. 2019). "A good-faith assertion of qualified immunity alters the usual summary judgment burden of proof, shifting it to the plaintiff to show that the defense is not available." *Voss v. Goode*, 954 F.3d 234, 238 (5th Cir. 2020). To shift the burden to the plaintiff, a defendant must "establish[] that the challenged conduct was within the scope of his discretionary authority," meaning the conduct that occurred was a "non-ministerial act[] within the boundaries of his official

capacity." *Cherry Knoll, L.L.C. v. Jones*, 922 F.3d 309, 318 (5th Cir. 2019).

"A plaintiff must make a two-part showing to overcome a qualified immunity defense. First, [he] must show that the official violated a statutory or constitutional right; second, [he] must show that the right was clearly established at the time." *Voss*, 954 F.3d at 238. A court "can analyze the prongs in either order or resolve the case on a single prong." *Garcia v. Blevins*, 957 F.3d 596, 600 (5th Cir. 2020). "Conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation are all insufficient to overcome immunity." *Orr v. Copeland*, 844 F.3d 484, 490 (5th Cir. 2016).

Because there is no dispute regarding whether the officers were acting within their discretionary authority at all relevant times, the burden shifts to Jason to defeat summary judgment by showing a genuine issue of material fact as to whether the individual defendants violated a clearly established statutory or constitutional right.

### 1. Constitutional violation

The defendants argue that Jason cannot establish a Fourth Amendment violation because (1) "there was plenty of probable cause to arrest [Austin] that day for larceny, felony fleeing, and grand larceny for the theft of the law enforcement truck," making any seizure reasonable and (2) the officers did not use excessive force because Austin "was using the first stolen truck as a weapon" when he drove through highly populated areas at a high rate of speed and used the County vehicle as a weapon when he drove it "straight toward Captain Ric Higgins."[15] Doc. #70 at 14–22. To the extent Jason alleges claims under the Fourteenth and Eighth Amendments, the

---

[15] The defendants also argue that Austin used the County vehicle as a weapon when he drove it "straight at Constable Griffin." Doc. #70 at 19. However, because neither the video nor the Deputy Defendants' statements reflect that they saw Austin driving towards Griffin, this argument is not supported by the record and will not be considered. *See Cole v. Carson*, 935 F.3d 444, 456 (5th Cir. 2019) (courts "consider only what the officers knew at the time of their challenged conduct").

defendants argue such claims are properly brought under the Fourth Amendment. *Id.* at 23.

### a. Eighth and Fourteenth Amendments

Jason fails to address the defendants' arguments with respect to his Eighth and Fourteenth Amendment claims. This failure to respond amounts to an abandonment of these claims. *See Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 339–40 (5th Cir. 2005) ("If a party fails to assert a legal reason why summary judgment should not be granted, that ground is waived and cannot be considered or raised on appeal."); *City of Canton v. Nissan N. Am., Inc.*, 870 F. Supp. 2d 430, 437 (S.D. Miss. 2012) ("Failure to address a claim results in the abandonment thereof."). Accordingly, these abandoned claims are properly dismissed.

### b. Seizure

To the extent Jason pleads a seizure claim independent of the shooting, he similarly fails to address the defendants' argument that there was probable cause to arrest Austin.[16] Because this failure to respond amounts to an abandonment, *see Keelan*, 407 F.3d at 339–40, this abandoned claim is also properly dismissed.

### c. Excessive Force

As to the shooting, Jason argues that "Culpepper admitted in his deposition that as long as Austin is not on top of the tracks, there's nobody's life in danger" such that no one was in danger when the shooting began; "[e]very time Austin was confronted by an officer, [he] ran" such that "it is undisputed that Austin posed no danger to either Culpepper or Honnoll;" the Deputy Defendants were "not involved with several parts of the chase and did not witness many of the aggressive acts alleged by the defendants;" and Austin did not use the County vehicle as a weapon

---

[16] Although Jason argues the pursuit of Austin was unlawful under Mississippi law, he does not present any argument as to why it amounts to a constitutional violation. *See* Doc. #84 at 4-5.

because it "was never even pointed at the officers." Doc. #84 at 3, 6–7 (internal quotation marks omitted). Jason submits that "[a] number of courts have found police officers' shooting of fleeing motorists to be unreasonable—or at least potentially so, for the purposes of qualified immunity— where the driver posed a lesser risk of harm to others." *Id.* at 11. Jason points to Higgins' report to argue that "Higgins himself never perceived any real or immediate threat of danger." *Id.* at 14.

The defendants respond that because "auto theft is a serious offense;" Austin "actively resisted arrest by ignoring the express and repeated instructions of law enforcement and … attempted to evade arrest by flight using the stolen vehicle;" and Austin "posed a serious threat to the officers or others," all three of the reasonableness factors announced in *Graham v. Connor*, 490 U.S. 386 (1989),[17] weigh in favor of finding the use of force reasonable. Doc. #89 at 6–7.

 "[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham*, 490 U.S. at 395 (emphasis omitted). "To prevail on an excessive force claim, a plaintiff must show (1) an injury (2) which resulted directly and only from the use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Orr*, 844 F.3d at 492. "The 'excessive' and 'unreasonable' inquiries require the court to exercise 'cautio[n] about second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation.'" *Jackson v. Gautreaux*, 3 F.4th 182, 186 (5th Cir. 2021). "An officer's use of deadly force is presumptively reasonable when the officer has reason to believe that the suspect poses a threat of

---

[17] "Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (cleaned up).

serious harm to the officer or to others." *Orr*, 844 F.3d. at 493. "The threat to the officer's life—
and therefore the reasonableness of the force used—must be judged from the perspective of a
reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 493–94.
Because "[e]xcessive-force claims are necessarily fact-intensive, [courts] must examine the totality
of the circumstances to determine whether the officer's actions were objectively unreasonable."
*Roque v. Harvel*, 993 F.3d 325, 333 (5th Cir. 2021) (internal quotation marks omitted).

Here, though an officer—presumably Higgins—can be seen on the tracks during a break
in the shooting, the videos do not show whether an officer was in the path of the truck at the time
the shooting began. Docs. #68-25, #68-26. However, the Deputy Defendants' statements reflect
that Austin was driving towards Higgins. *See* Doc. #68-13 at PageID 591 (Honnoll's statement
that Austin "was headed towards Lt. Rick [sic] Higgins, who was standing on the tracks); Doc.
#69-6 (Culpepper's statement that Austin "was driving the vehicle right towards Administrator
Higgins"). Jason attempts to dispute this fact based on Higgins' statement that "[t]he vehicle was
not driving fast down the tracks and [he] got between the two sets of track [sic] so [he] would not
be immediately in front of the truck." Doc. #69-5 at PageID 665–66. But the fact that Higgins
was between the two sets of tracks rather than on top of a particular set, such that the vehicle was
not headed *directly* at him, does not create a genuine factual dispute as to whether, from the vantage
point of Culpepper and Honnoll—who, based on the videos, were looking up towards the tracks
at a lower elevation from where there is no visible distinction between being on or between the
tracks—the vehicle was headed in Higgins' direction. And though Jason points to Higgins'
statement to argue that Higgins himself did not feel threatened, the relevant question is whether
the Deputy Defendants had reason to believe Higgins was in danger.

Jason argues that "Culpepper admitted in his deposition that as long as Austin is not on top

of the tracks, 'there's nobody's life in danger.'" Doc. #84 at 9 (citing Doc. #84-1 at 36). When asked in his deposition whether there is a "difference between [Austin] being on top of the railroad tracks versus being in the grass still" when the shooting starts, Culpepper responded there was because "if [Austin] was in the grass headed towards that, there's nobody's life in danger at this point." Doc. #84-1 at 36. While the body camera video shows that the Dodge was still in the grass at the time the shooting starts, it was driving towards, and eventually crossed, the railroad tracks. *See* Docs. #68-25, #68-26. Viewing the body cam footage in combination with the officers' uncontradicted statement regarding the truck's trajectory towards Higgins, and in the absence of evidence placing in dispute whether Austin was driving in the direction of other officers, it was reasonable for the Deputy Defendants to believe Austin posed a serious threat to at least one officer. *See Craig v. Martin*, __ F.4th __, 2022 WL 4103353, at *7 (5th Cir. Sept. 8, 2022) ("In the face of … summary judgment evidence [including video evidence, defendant's declaration, and commanding officer's declaration], it was then incumbent upon [plaintiff] to produce evidence, not mere allegations, that raised a genuine dispute of material fact.").

Given the totality of the circumstances leading up to the shooting and given that the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving,"[18] Honnoll's and Culpepper's use of force was reasonable. The officers discharged their weapons after (1) being led by Austin on a high-speed chase through residential neighborhoods, during which Austin drove towards Culpepper causing Culpepper to drive off the road to avoid being hit by Austin, (2) hearing that Austin struck two vehicles during the chase, (3) hearing a "shots fired" call across the radio, (4) attempting to locate Austin after he fled on foot, (5) seeing

---

[18] *Roque¸*993 F.3d at 329.

Austin fleeing in a County vehicle, and (6) watching Austin drive the vehicle towards the direction of at least one officer. *See Jackson*, 3 F.4th 182 at 186-88 (analyzing cases and concluding use of deadly force reasonable where suspect "was using his car as a weapon," "exhibited volatile behaviors," and there was not "any evidence that suggest[ed] the officers might've had a reasonable alternative course of action"); *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014) (officers were entitled to qualified immunity for claims related to shooting of driver who led them on a high-speed chase during which he "passed more than two dozen other vehicles, several of which were forced to alter course" because driver's "flight posed a grave public safety risk, and … the police acted reasonably in using deadly force to end that risk").

### 2. Clearly established

Even had the facts alleged amounted to a constitutional violation, Jason cannot show Honnoll or Culpepper violated a clearly established constitutional right.

> The burden here is heavy: A right is clearly established only if preexisting precedent has placed the constitutional question beyond debate. And, as the Supreme Court has repeatedly admonished lower courts, [courts] must define that constitutional question with specificity. Indeed, the dispositive question is whether the violative nature of *particular* conduct is clearly established.
>
> The specificity requirement assumes special significance in excessive force cases, where officers must make split-second decisions to use force. The results depend very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue. To overcome qualified immunity, the law must be so clearly established that *every* reasonable officer in [the position of the officers in the case] would have known he could not use deadly force.

*Harmon v. City of Arlington*, 16 F.4th 1159, 1165–66 (5th Cir. 2021).

Jason cites *Lytle v. Bexar County*, 560 F.3d 409 (5th Cir. 2009),[19] as "a more appropriate

---

[19] Hines also points to several decisions outside this federal circuit. *See* Doc. #84 at 11–12. None of the cited decisions address the facts presented here.

comparison" than *Jackson*, the case on which the defendants rely. *Id.* at 13–14. The defendants

reply that the pursuit in *Lytle* was significantly different than the pursuit here with respect to length,

speed, and amount of damage and that "*Lytle* [] does not address the aggravating factors of shots

fired, Austin … having a weapon, stealing a law enforcement vehicle, trying to run over a deputy

and beginning a second run." Doc. #89 at 16–17.

> In *Lytle*, a police officer fatally shot a teenage passenger in a fleeing car that was,
> allegedly, three or four houses down the block from him. [The Fifth Circuit]
> rejected the officer's qualified immunity defense because by the time the car was
> three or four houses away, a jury could conclude that any immediate threat to the
> officer had ceased.

*Harmon*, 16 F.4th at 1166.

As in *Lytle*, Austin was driving away from the Deputy Defendants at the time they

discharged their weapons. However, as discussed above, Austin was driving in the direction

towards at least one other officer. And Jason has "failed to identify any clearly established law

that would place beyond doubt the constitutional question in this case, whether it is unreasonable

for an officer to use deadly force when"[20] he observes a fleeing vehicle driving towards a fellow

officer. Because Jason has failed to meet his burden, the Deputy Defendants are entitled to

qualified immunity on the excessive force claims and summary judgment on these claims is

appropriate.

## C. State Law Claims

The defendants argue all of Jason's state law claims should be dismissed under the

Mississippi Torts Claim Act because "[i]ndividuals, such as the individually named officers, can

never be personally liable for acts or omissions within the course and scope of their employment"

and because Jason cannot recover on his claims since Austin was "engaged in criminal activity at

---

[20] *Harmon*, 16 F.4th at 1167.

the time of his injury." Doc. #70 at 30 (internal quotation marks omitted). Jason responds that "[p]ursuant to ¶ 55 of the Amended Complaint, [he] made several individual claims"[21] against the defendants and they "have not asked for the dismissal of any of these claims and [he] was not involved in any criminal activity." Doc. #84 at 15.

Because all the federal claims have been dismissed by stipulation, abandoned, or determined to be appropriate for summary judgment, no federal question remains. Since the parties' lack of diversity precludes diversity jurisdiction, the Court must use its discretion to decide whether to exercise supplemental jurisdiction over the state law claims. *See Heggemeir v. Caldwell Cnty.*, 826 F.3d 861, 872 (5th Cir. 2016). The supplemental jurisdiction statute, 28 U.S.C. § 1367, provides:

> The district courts may decline to exercise supplemental jurisdiction … [if] (1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). Courts in the Fifth Circuit treat the four circumstances enumerated in § 1367 as "statutory factors" to consider when evaluating supplemental jurisdiction. *Enochs v. Lampasas Cnty.*, 641 F.3d 155, 159 (5th Cir. 2011). "The general rule is that a court should decline to exercise jurisdiction over remaining state-law claims when all federal-law claims are eliminated before trial." *Watson v. City of Allen*, 821 F.3d 634, 642 (5th Cir. 2016).

The defendants' immunity under the Mississippi Torts Claim Act would be better addressed by the state courts. This Court therefore declines to exercise supplemental jurisdiction over the state law claims. The defendants' motion to strike Jason's expert and the parties' motions

---

[21] The cited paragraph of the amended complaint states: "In addition to all claims made pursuant to Miss. Code Ann. § 11-7-13, Plaintiff does hereby assert claims against the Defendants for negligence, gross negligence, infliction of emotional distress, negligence *per se*, loss of society and companionship and punitive damages." Doc. #54 at ¶ 55.

in limine will be denied without prejudice to being renewed in the state court.

**V**
**Conclusion**

Based on the discussion above:

1.      Jason's abandoned § 1983 claims against the County and Hawkins, in both his individual and official capacities, as well as his abandoned Eighth, Fourteenth, and Fourth Amendment seizure claims against the Deputy Defendants are **DISMISSED with prejudice**.

2.      The defendants' motion for summary judgment [68] is **GRANTED in Part and DENIED in Part**. It is GRANTED with respect to Jason's excessive force claims against the Deputy Defendants. It is DENIED as moot with respect to Jason's abandoned claims and DENIED without prejudice with respect to Jason's state law claims.

3.      Jason's state law claims are **REMANDED** to the Circuit Court of Lowndes County.

4.      The remaining motions to strike [71] and in limine [96][98][100][102][104] are **DENIED without prejudice** to being renewed in the Circuit Court.

**SO ORDERED**, this 27th day of September, 2022.

                          **/s/Debra M. Brown**                
                          **UNITED STATES DISTRICT JUDGE**